**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1104-23

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

SAMUEL COGGINS,

      Defendant-Appellant.

_____

Argued May 6, 2026 – Decided July 27, 2026

Before Judges Gummer, Paganelli, and Jacobs.

On appeal from the Superior Court of New Jersey, Law Division, Somerset County, Indictment No. 22-09-0446.

Alyssa Aiello, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Alyssa Aiello, of counsel and on the briefs).

Emily M. M. Pirro, Assistant Prosecutor, argued the cause for respondent (John P. McDonald, Somerset County Prosecutor, attorney; Emily M. M. Pirro, of counsel and on the brief).

PER CURIAM

Defendant Samuel Coggins appeals from his convictions, following a jury verdict, for first-degree murder and first-degree bias intimidation. We affirm.

I.

On July 14, 2022, Manville Police responded to a report of an assault with an unconscious victim. On arrival, Detective Sean Carroll observed Augustine Garcia "laying on his back. He had a cardboard box under his head, and he was bleeding profusely out of his mouth and nose area. . . . [with] traumatic injury to his face." Garcia later died from his injuries at the hospital.

Ring video footage from a house directly across the street recorded the incident. Defendant and Garcia can be seen standing in the driveway. Defendant says, "You're outside. Come here." Defendant is then seen punching Garcia in the face, causing him to fall to the ground. Once on the ground, defendant repeatedly stomps on Garcia's head.

Defendant called 9-1-1, claiming self-defense and referencing Garcia's immigration status. He told the operator he had been attacked by "an illegal Honduran alien" and that he had "kicked him [o]n the ground and stomped on him a little," adding "[t]his is what happens to his people when they're not

A-1104-23

deported safely."  After his arrest, officers observed no injuries to defendant's body, nor did he report experiencing any pain.

At the time of the attack, defendant was at the residence to assist Susan Stranzenbach and her roommate, Garcia, with moving to a new home. Stranzenbach testified that although she had never heard defendant say anything to Garcia about being in the country illegally, defendant frequently complained about illegal immigrants "taking everybody's jobs."  Claudia Garcia, Garcia's sister, testified that on July 7, 2022, seven days before the murder, she was on a video call with her brother when defendant suddenly appeared and grabbed Garcia by the neck.  According to Claudia,[1] defendant released Garcia "as soon as he realized it was a video call[.]"

Police arrested defendant and charged him with murder.  After police administered Miranda[2] rights, defendant gave a statement to Detective Michael Grosso, describing the events leading up to the homicide:

> [DEFENDANT]:  Most days the character in question, [Garcia], was drunk and physically violent with me in the workplace.
>
> [DETECTIVE]:  Okay.

---

[1]  We refer to Claudia Garcia as "Claudia" for ease of reading given her shared last name with her brother.  We mean no disrespect in doing so.

[2]  Miranda v. Arizona, 384 U.S. 436 (1966).

A-1104-23

[DEFENDANT]: I asked [Stranzenbach] why hasn't [Garcia] been deported or arrested? And she says, every time he just goes to the Hunterdon Medical Center for detox and he comes back drunker and angrier the next day.

[DETECTIVE]: Okay.

[DEFENDANT]: I say, well, let's get this move done, I don't want to deal with him anymore.

And I'm trying to be nice, but then he gets drunk and violent again, so me and [Stranzenbach] leave the house, her house, to get away from him, have a cigarette outside. At which point, [Garcia] proceeds to come outside and take a sneak shot at me in the kidney from behind, and then run -- not run, but walked towards the passenger seat of the car.

So, I move from the door to the front of him. I tell him, you put your hands on me, you're done. I hit him twice, I kick him, and then I see him make fists and get angry, trying to get up and hurt me, so I closed my eyes and I tried to stomp on his chest, but I don't think I hit his chest.

[DETECTIVE]: Okay.

[DEFENDANT]: And I saw there was blood on his nose and I thought, oh, he's f[***]ed, he'll be down for a few minutes, and he might need to go to the hospital afterwards.

[DETECTIVE]: Okay.

[DEFENDANT]: And I tell [Stranzenbach], listen, . . . I'm sorry about what happened, but he hit me again. This is like the eighth time this week.

4

A-1104-23

. . . .

[DETECTIVE]:  So, what led up to him and you having these problems . . . inside of the home that day? . . .

[DEFENDANT]:  . . . I don't know what his situation is, but he's been in here, this country, illegally, in and out, for the past ten years.  Never made any attempt to learn English.

[DETECTIVE]:  Okay.  Does that bother you?

[DEFENDANT]:  A bit.

Defendant stated he argued with Garcia during the preceding week about how "[y]ou should speak English if you're going to come to the United States. . . . We would say, people in America do things right so we don't destroy our country and need to move to another one. . . ."  "I told him, maybe you should be deported for hitting people . . . and being an illegal immigrant."  Garcia would call him a racist, which defendant denied, stating, "I'm not a racist, I'm a nationalist."

When questioned about how he arrived at the house the previous day, defendant raised a 2019 incident involving a Latina taxi driver:

[DEFENDANT]:  . . . [T]hey wanted me to take a Vamos Taxi.

. . . .

5

[DEFENDANT]:  I said I'm not going to take a Latino taxi after 2019.  A Latino taxi put me in jail for an assault when it should have been a self-defense case.

[DETECTIVE]:  Okay.

[DEFENDANT]:  [The Latina taxi driver] was driving 85 in a 60.  She was stomping on the pedal.  She almost killed me three times on the road before I pulled her away from the controls with a rubber hose.  There was no body that time.

When asked about his income, defendant again referenced the 2019 incident:

I had [Supplemental Security Income] that just ran out and I was trying to get that fixed, and then they put me in [a] medical taxi with an illegal immigrant driving it and [the Latina taxi driver] was needing to be restrained from the controls so that she wouldn't kill me.

And then, when the police showed up, she miraculously learned English.  She said, help!  He try to kill me!  He kill me!  He kill me!  He try to kill me! He try to kill me!

Detectives asked defendant if he had ever "injured seriously" another person.  He again referenced the taxi incident, stating, "I wouldn't say seriously. I choked out the taxi driver in 2019, but I was counting.  I didn't hold it longer than ten seconds."

At defendant's trial, the Latina taxi driver testified that while she was driving defendant, he had asked her to stop during the ride.  When she refused,

6

he became angry and attempted to strangle her with a rubber hose, akin to the kind used to drink liquid from a backpack.

> And then he got something plastic. I think it was something to drink water or juice. I was watching him through the rearview mirror and I saw him, . . . when he lifted it and threw it, and I got the rubber part, the thick part that . . . he took against me, and so I . . . turned off the car as it was running and with this hand I was able to open the door.
>
> I started calling for help. Some people stopped and they called the police.

She then explained, defendant had hit her in the face, "pulled [her] hair and he hit [her] . . . in the neck." During the attack, defendant told her she "was a f[***]ing immigrant, that [she] was a crazy person[.]"

In September 2022, a Somerset County grand jury returned an indictment, charging defendant with first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2) and -3(b)(4)(c) (count one); and first-degree bias intimidation, N.J.S.A. 2C:16-1(a)(1) and (2) (count two).

In May 2023, the trial judge, Peter J. Tober, conducted a N.J.R.E. 104 hearing on the State's motion to admit other crimes evidence pursuant to N.J.R.E. 404(b). The judge heard testimony from Detective Grosso, who had recorded defendant's statement regarding the incident with the Latina taxi driver. Patrolman Adrian Larowe also testified regarding defendant's violent encounter

7

with the Latina taxi driver.  Claudia testified regarding the choking incident she witnessed during a video call in 2022, shortly before the murder.   Additionally, the State proffered two prior judgments of conviction.

The judge considered the testimony and underlying proofs under the standard announced in State v. Cofield, 127 N.J. 328, 338 (1992), and found all four factors favored admission:

> Here[,] the [c]ourt finds that all of the proposed evidentiary submissions are relevant to the issue in dispute.
>
> Certainly . . . what Claudia . . . ,  who testified here in court credibly, witnessed, she was on a . . . Whatsapp call with her brother.  She observed [defendant], who she plainly identified in court, choking her brother.  Once he realized it was a video call, [defendant] stopped.  She asked her brother who it was and the brother said [defendant].  She showed the [p]rosecutor's [o]ffice investigators the cell phone with the video call that indicated that the call was placed [at] 8:24 on J[uly] 7[] of 2023 . . . and the number was to. . . her brother's number[.] . . .
>
> It's close in time to the alleged incident, [f]actor [n]umber [two] of the Cofield test.  It's similar in kind. The victim was allegedly stomped on the head and injured.  It's clear and convincing. . . .
>
> Considering the statement to the Somerset County Prosecutor's Office where [defendant] talks about the underlying crime and references . . . his conduct in 2019.  The [c]ourt also finds that that's relevant, that it's similar in kind, 2019 is reasonably

8

close in time to July 14[], 2022.  That . . . statement, [and] the transcript thereof[,] is clear and convincing. . . .

. . . .

Lastly, the State is seeking to admit the two [judgments of conviction] that represent the . . . convictions from 2019.  They are certainly relevant to the issue in dispute.  They're similar enough in kind. They're clear and convincing.

. . . .

Here[,] the basic issue in the case is going to be did [defendant] stomp on the head of . . . Garcia and cause his death and did he do so because of . . . Garcia's race, ethnic origin, or background.  And I think that the incident involving . . . [the Latina taxi driver], who's of Hispanic origin, . . . the proffer is that [defendant] was upset by her speaking Spanish, that he attempted to strangle her with a rubber hose.

He has a different version of events.  He said he tried to stop her because she was driving unsafely.  His counsel can raise that during cross-examination.  He can cross-examine [the Latina taxi driver].  The [c]ourt notes, yes, it was . . . Patrolman Larowe talking about the incident.  He doesn't have knowledge of it.  He didn't witness it in the taxi cab.  At the time of trial, certainly the State, to avoid that objection, will have to locate and produce . . . [the Latina taxi driver] to testify.

But in terms of a [N.J.R.E.] 404 evidentiary ruling, the [c]ourt here finds that . . . not only is . . . there[] no doubt that there's a great deal of prejudice to [defendant], but the prejudice -- the probative value is so high.  These . . . issues go right to the idea of bias.

9

It's a similar modus of operandi. It resulted in a very different end. There was no death. But someone . . . was assaulted because they were speaking Spanish. The video call showed the victim's own sister observing a prior assault. It couldn't be more relevant.

Judge Tober entered a May 9, 2023 order granting the State's motion, permitting the following to be entered in evidence:

1. . . . Claudi[a's]. . . video call with [Garcia] on July 7, 2022, to include witness testimony and photographs;

2. . . . [Defendant]'s post-<u>Miranda</u> [s]tatement of July 15, 2022, that referenced an incident that occurred on July 19, 2019;

3. Evidence from the July 19, 2019[] incident that took place between [defendant] and . . . [the Latina taxi driver], to include witness testimony and photographs;

4. . . . a [j]udgment of [c]onviction for the disorderly person's offense of [r]ecklessly [e]ndangering [a]nother stemming from the July 19, 2019 incident.

Shortly before trial commenced in September 2023, the judge conducted a hearing on the State's motion to redact portions of defendant's post-<u>Miranda</u> statement. The State sought to redact portions pertaining to his carceral exposure, Garcia's former military service, and Garcia's alleged prior bad acts, often referred to as "reverse [N.J.R.E.] 404(b)" incidents. Defendant opposed the motion, arguing the State should elect to admit the statement unredacted or not at all. The judge agreed and denied the State's motion, ordering "if the State

10

wishes to present the [post-]<u>Miranda</u> [statement] to the jury, the entire statement shall be admitted without redactions."

The trial took place over a two-week period. At the conclusion of testimony, Judge Tober conducted a jury charge conference. The following exchange occurred regarding how the jury should consider the credibility of defendant's statements to police in view of his disorderly persons offense conviction for reckless endangerment, N.J.S.A. 2C:24-7.1, stemming from the 2019 taxi incident:

> THE COURT: Credibility, prior conviction of a defendant, that stays in.
>
> [DEFENSE COUNSEL]: Your Honor, it stays in. . . . [I]t raises some interesting and more wild issues related to this [N.J.R.E.] 404(b). It reads: [y]ou have heard evidence that [defendant] has been previously convicted of a crime or crimes.
>
> THE COURT: I was going to put an offense, because it's --
>
> [DEFENSE COUNSEL]: It -- I believe –
>
> THE COURT: -- a disorderly persons offense.
>
> [DEFENSE COUNSEL]: -- it's an offense at this point.
>
> THE COURT: Right. And so I –
>
> . . . .

11

THE COURT:  -- already have that as written.

[DEFENSE COUNSEL]:  Okay.

THE COURT:  You don't have that in what's before you, but that was my thought.

[DEFENSE COUNSEL]:  Okay.

THE COURT:  So, strike bracket[] A, bracket S, and insert "has previously been convicted of an offense." And then we should make every reference to crime in that paragraph offense[,] correct?

[DEFENSE COUNSEL]:  I believe so, --

[PROSECUTOR]:  Yes.

[DEFENSE COUNSEL]:  -- Your Honor.  I don't mean to do that, but yes.

THE COURT:  All right.  Through -- I'm just going to say -- would you be -- in the second paragraph where it says "failed to comply with society's rules as demonstrated through a criminal conviction" -- as demonstrated through a criminal offense?  Or can you not say criminal offense, can you just say --

[PROSECUTOR]:  Through a disorderly persons?

THE COURT:  Offense?

[DEFENSE COUNSEL]:  Or even disorderly persons conviction?

THE COURT:  Yeah, . . . I could do that. . . .

[PROSECUTOR]:  That's fine.

12

A-1104-23

THE COURT: Strike criminal and add disorderly persons. Okay. Through a [disorderly persons] conviction.

And then I'll use "it" and singular on the top of the next page.

Okay. All right. I think that gets it. . . .

Consistent with this exchange, the judge instructed the jury without objection:

You've also heard evidence that [defendant] has previously been convicted of an offense. This offense . . . may only be used in determining credibility or believability. You may not conclude that . . . [defendant] committed the crime charged in this case or is more likely to have committed the crime charged here simply because he committed another offense on another occasion.

A jury has a right, however, to consider whether a person who has previously failed to comply with society's rules, as demonstrated through a disorderly persons conviction, whether they would be more likely to ignore the oath regarding . . . truthfulness on the witness stand than a person who has never been convicted of any crime. You may consider this in determining this issue, the nature and degree of the prior conviction and when it occurred.

Now, our law permits a conviction to be received in evidence only for the purpose of affecting the credibility of the defendant and for no other purpose. You're not, however, obligated to change your opinion as to the credibility of the defendant simply because of the prior conviction. You may consider such evidence,

13

along with all the other factors we previously discussed in determining the credibility.

On October 3, 2023, the jury returned a verdict of guilty for both counts in the indictment. On November 13, 2023, Judge Tober sentenced defendant on the murder charge to life imprisonment without parole pursuant to N.J.S.A. 2C:11-3(b)(4). For the bias-intimidation conviction, he imposed a concurrent twenty-year sentence. The judge found aggravating factors one (nature and circumstances of the offense), two (gravity and seriousness of harm), three (risk defendant will commit another offense), six (prior criminal record), and nine (need for deterrence) present, and no mitigating factors. See N.J.S.A. 2C:44-1(a)(1), (2), (3), (6), (9); N.J.S.A. 2C:44-1(b).

On appeal, defendant raises the following arguments:

POINT I

A SLEW OF ERRORS RELATED TO THE IMPROPER ADMISSION AND/OR SANITIZATION OF HIGHLY PREJUDICIAL [N.J.R.E.] 404(b) EVIDENCE DEPRIVED [DEFENDANT] OF A FAIR TRIAL AND REQUIRES REVERSAL.

A. The Hearing on the State's Motion to Admit [N.J.R.E.] 404(b) Evidence.

B. Contrary to the State's Assertion and the Trial Court's Ruling, [N.J.R.E.] 404(b) Does Not Permit the Admission of Prior Bias Assaults to Show That a Defendant Committed Bias Murder.

14

C. The Court's Error in Admitting the 2019 Assault Against [the Latina Taxi Driver] as Evidence of [Defendant's] Propensity to Commit Bias Crimes Was Magnified by the Fact That [the Latina Taxi Driver]'s Trial Testimony Failed to Establish That the Assault Was a Bias Crime in the First Place.

D. To the Extent the Anti-Immigrant Sentiment Expressed by [Defendant] During the 2019 Assault Was Relevant to Show Bias, Its Admission Was Unnecessary in Light of All the Other Evidence of Bias. Alternatively, the Trial Court Erred in Failing to Sanitize the Evidence Before Admitting It.

E. No [N.J.R.E.] 404(b) Charge, Let Alone the One Given Here, Could Mitigate the Prejudice Resulting from the Errors Committed by the Trial Court. Therefore, [Defendant's] Convictions Must Be Reversed.

POINT II

BY ERRONEOUSLY INCLUDING IN ITS FINAL CHARGE AN INSTRUCTION ON IMPEACHMENT BY EVIDENCE OF [A] PRIOR CONVICTION, THE TRIAL COURT CREATED THE INESCAPABLE DANGER THAT THE JURY IMPROPERLY CONSIDERED [DEFENDANT'S] CONVICTION FOR RECKLESS ENDANGERMENT IN ASSESSING THE CREDIBILITY OF HIS STATEMENT. (Not Raised Below).

POINT III

[DEFENDANT'S] CONVICTION FOR BIAS-INTIMIDATION MUST BE REVERSED BECAUSE THE TRIAL COURT FAILED TO INSTRUCT THE JURY THAT IT MUST UNANIMOUSLY AGREE AS

15

TO WHICH OF THE CONCEPTUALLY DISTINCT SUBSECTIONS OF BIAS-INTIMIDATION HE VIOLATED. (Not raised Below).

## II.

"We defer to a trial court's evidentiary ruling absent an abuse of discretion." State v. Garcia, 245 N.J. 412, 430 (2021) (citing State v. Nantambu, 221 N.J. 390, 402 (2015)). "Under that deferential standard, we review a trial court's evidentiary ruling only for a 'clear error in judgment.'" State v. Medina, 242 N.J. 397, 412 (2020) (quoting State v. Scott, 229 N.J. 469, 479 (2017)). "A trial court's 'discretion is abused when relevant evidence offered by the defense and necessary for a fair trial is kept from the jury.'" State v. R.Y., 242 N.J. 48, 65 (2020) (quoting State v. Cope, 224 N.J. 530, 554-55 (2016)).

Prior Bad Acts

N.J.R.E. 404(b) provides:

> (b) Other Crimes, Wrongs or Acts.
>
> > (1) Prohibited Uses. Except as otherwise provided by Rule 608(b), evidence of other crimes, wrongs, or acts is not admissible to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition.
>
> > (2) Permitted Uses. This evidence may be admitted for other purposes, such as proof

16

of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident when such matters are relevant to a material issue in dispute.

[(Boldface omitted).]

In Cofield, the Court held:

[T]o avoid the over-use of extrinsic evidence of other crimes or wrongs:

1. The evidence of the other crime must be admissible as relevant to a material issue;

2. It must be similar in kind and reasonably close in time to the offense charged;

3. The evidence of the other crime must be clear and convincing; and

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[127 N.J. at 338 (quoting Abraham P. Ordover, Balancing The Presumptions Of Guilt And Innocence: Rules [of Evidence] 404(b), 608(b), And 609(a), 38 Emory L.J. 135, 160 (1989) (footnote omitted)).]

"In addition to being relevant to an issue genuinely in dispute, the other-crime evidence must 'be necessary for [the disputed issue's] proof.'" State v. Marrero, 148 N.J. 469, 482 (1997) (alteration in original) (quoting State v. Stevens, 115 N.J. 289, 301 (1989)). "Because of its damaging nature, in determining the probative worth of other-crime evidence, 'a court should

17

consider . . . whether its proffered use in the case can adequately be served by other evidence.'" Ibid. (omission in original) (quoting Stevens, 115 N.J. at 303). "Once it is determined that the other-crime evidence is material to a fact genuinely in issue and that the other-crime evidence is necessary, 'the probative value of the proffered evidence [must] be carefully balanced against the danger that it will create undue prejudice against the defendant.'" Ibid. (alteration in original) (quoting Stevens, 115 N.J. at 302).

N.J.S.A. 2C:16-1(b) states:

> Permissive inference concerning selection of targeted person or property. Proof that the target of the underlying offense was selected by the defendant, or by another acting in concert with the defendant, because of race, color, religion, gender, disability, sexual orientation, gender identity or expression, national origin, or ethnicity shall give rise to a permissive inference by the trier of fact that the defendant acted with a purpose to intimidate an individual or group of individuals because of race, color, religion, gender, disability, sexual orientation, gender identity or expression, national origin, or ethnicity.

Defendant argues "[p]ermitting the State to introduce evidence that [defendant] committed a bias crime in the past as evidence that he committed a bias crime in this case is precisely what [N.J.R.E.] 404(b) prohibits." He asserts evidence of the prior assaults was not admitted for the proper non-propensity purpose of establishing defendant's anti-Hispanic animus, but, instead, was

18

admitted for the improper purpose of demonstrating "a propensity to assault people who are Hispanic."

Based on our review of the record, we are satisfied Judge Tober properly applied the Cofield factors, finding the prior incidents relevant to motive—not propensity—"similar in kind" and "close in time," by a clear and convincing standard, and not unduly prejudicial given their probative value. Cofield, 127 N.J. at 338. The evidence admitted went toward establishing defendant's motive through permissive inference authorized under N.J.S.A. 2C:16-1(b).

More generally, the State was entitled to meet its burden of proving a motive of bias intimidation through a clear instance of anti-immigrant sentiment. The test for admission is not, as argued by defendant, whether such evidence was necessary or unnecessary in light of all other evidence of bias. We have long recognized that "[w]hile personal attitudes about race generally have no place in the courtroom and comments regarding them should generally be prohibited, [a] defendant's purpose or intent [i]s relevant to the elements charged in" a bias-intimidation prosecution. State v. Davidson, 225 N.J. Super. 1, 15 (App. Div. 1988). Where, as here, the State must establish a defendant's specific state of mind, intent, or motive—such as the purpose to intimidate under the bias-intimidation statute—the State is permitted "a wider range of evidence[.]"

State v. Long, 173 N.J. 138, 162 (2002) (quoting State v. Covell, 157 N.J. 554, 565 (1999)). The State is thus entitled to attempt to prove a defendant's bias motive or state of mind through relevant evidence and its ability to do so is not constrained by the defense's assertion that alternative evidence is sufficient to meet that burden.

Based on our review of the record, we are satisfied with the judge's analysis of the Cofield factors. The admission of evidence regarding the 2019 taxi-driver incident, including defendant's statements, was measured. Similarly, the judge's determination that the probative value of assault on her brother as video recorded by Claudia outweighed its prejudicial effect was thorough and not an abuse of discretion. Additionally, we are satisfied the judge's limiting instructions to the jury were sufficient to counter any undue prejudice.

Jury Instructions

"Generally, failure to 'object or otherwise preserve an issue for appeal at the trial court level' limits appellate review to a plain error inquiry." State v. G.E.P., 243 N.J. 362, 389 (2020) (quoting State v. Santamaria, 236 N.J. 390, 404 (2019)). Under this standard, any unchallenged error or omission must be disregarded by us "unless it is of such a nature as to have been clearly capable of producing an unjust result[.]" R. 2:10-2. Because counsel did not object to

20

the jury charge in general or the bias-intimidation instruction in particular, we review both claims for plain error.

Defendant maintains the jury should not have been permitted to consider defendant's disorderly persons jury instruction "for two reasons:  (1) [defendant] did not testify at trial[;] and (2) under N.J.R.E. 609, only convictions for crimes — not for disorderly persons offenses — may be admitted to impeach a witness's credibility."

Based on the record and the colloquy rendered above, it is apparent defense counsel specifically sought to tailor the jury instruction to reference his conviction of a disorderly offense rather than an indictable crime.  As the State argues, that tailoring was intended to mitigate defendant's admission in his statement that he had been convicted for assault.  In fact, he was convicted for reckless endangerment, a disorderly persons offense, N.J.S.A. 2C:24-7.1. Through an exchange with the court, counsel agreed to a charge that highlighted the conviction was not for a crime but rather a disorderly persons offense.  That outcome was consonant with the goal of tempering any potential undue prejudice.  We thus perceive no error capable of producing an unjust result.

Similarly, we have addressed and affirmed the judge's decision to permit evidence of the 2019 incident pursuant to a N.J.R.E. 404(b) analysis.  The

A-1104-23

attendant record of defendant's conviction associated with that incident, albeit for a disorderly persons offense rather than an indictable crime, does not per se preclude its reference pursuant to N.J.R.E. 609. Application of N.J.R.E. 609 is inapposite in this context because the intention of referencing defendant's conviction for a disorderly persons offense in the jury charge was to lessen the potential impact of the jury perceiving defendant was convicted of an indictable crime by virtue of his own statement. Error, if any, was invited through counsel's explicit strategy regarding a modified charge on the subject of credibility. See State v. A.R., 213 N.J. 542, 561 (2013) ("[I]f a party has 'invited' the error, he is barred from raising an objection for the first time on appeal.").

Unanimity Charge

Defendant challenges the verdict on the basis that the jury charge did not specifically emphasize the need for jurors to "unanimously agree as to which of the conceptually distinct subsections of bias-intimidation he violated." (Boldface omitted and capitalization modified). Defendant asserts the jury's verdict sheet—which did not require the jury to return a separate verdict as to the two subsections—renders unclear whether the verdict was unanimous as to either of the subsections because "the indictment charged [defendant] under subsections (a)(1) and (2), and the trial court read the model charge that pertains

22

to each subsection" but failed to "instruct the jury that unanimity was required as to each subsection."

Because this argument was not advanced at trial, we again assess its merit under the plain-error standard. Issues regarding jury verdicts "shall not be cognizable on appeal unless a motion for a new trial on that ground was made in the trial court." State v. Smith, 262 N.J. Super. 487, 511 (App. Div. 1993) (quoting R. 2:10-1). However, "we can proceed to the merits, if we choose, in the interest of justice." Ibid. In doing so, "our task is to decide whether 'it clearly appears that there was a miscarriage of justice under the law.'" Id. at 512 (quoting R. 2:10-1). Consistent with this high threshold of deference, "a general jury instruction on the requirement of unanimity" is ordinarily deemed sufficient. State v. Macchia, 253 N.J. 232, 256-57 (2023) (quoting State v. Parker, 124 N.J. 628, 641 (1991)).

Here, the trial judge issued a general unanimity charge. In assessing whether a specific, tailored unanimity instruction was instead required, we examine whether the underlying acts are conceptually similar or distinct and whether there is a "'tangible indication of jury confusion.'" Id. at 257 (quoting State v. Gandhi, 201 N.J. 161, 193 (2010)). A jury verdict will generally be upheld against challenges to the jury instructions or the unanimity of the verdict

23

absent "strong evidence of jury confusion" or "'danger of a fragmented verdict.'" Ibid. (quoting Parker, 124 N.J. at 635-37). Our examination of the record shows no indication of jury confusion or a fragmented verdict. The underlying acts were conceptually similar, and the jury presented no questions.

It is presumed the jury is capable of following, and has indeed followed, the trial court's instructions. State v. Herbert, 457 N.J. Super. 490, 503 (App. Div. 2019). Moreover, because defense counsel requested the charge, to the extent there may have been error, it was invited and not subject to reversal. A.R., 213 N.J. at 561. Under these circumstances we perceive no error "clearly capable of producing an unjust result." R. 2:10-2.

To the extent we have not specifically addressed any of defendant's remaining legal arguments, they are of insufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M. C. Hanley

Clerk of the Appellate Division

24